UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOHN WASHINGTON,

    Plaintiff,

v.                                      Case No. 23-cv-485-bhl

CLYDE JOHNSON,

    Defendant.

# DECISION AND ORDER

Plaintiff John Washington, who is representing himself, is proceeding on First and Eighth Amendment claims against Defendant Clyde Johnson in connection with allegations that Johnson (1) failed to provide Washington with necessary medical care following an April 7, 2020 basketball injury and (2) later retaliated against him by unlawfully searching his cell and issuing him a Conduct Report (#92766) after Washington filed an inmate complaint about the April 7 incident. Dkt. Nos. 18 & 19. Johnson has moved for summary judgment on both claims. Dkt. No. 21. The motion will be granted. As for Washington's first claim, while the parties dispute the facts surrounding Johnson's immediate reaction to Washington's injuries, the undisputed facts show that Washington received timely medical care on April 7, precluding any liability. Washington's second claim fails because the record confirms that the allegedly retaliatory search and Conduct Report were conducted and issued four days *before* Washington filed his inmate complaint and thus could not have been in retaliation for Washington's protected speech.

## UNDISPUTED FACTS

At the relevant time, Washington was an inmate at the Racine Correctional Institution, where Johnson was a correctional officer. Dkt. No. 23, ¶¶1-2. On April 7, 2020, Washington was

head-butted by another inmate during a basketball game and suffered an injury he characterizes as "big hole in the inside of his mouth/lower lip." Dkt. No. 19, ¶3. Washington claims he went to the officer's station and showed the injury to at least two officers sitting there—Johnson as well as "another officer who was working the other side of the unit." Dkt. No. 33, ¶6. Johnson unhelpfully responded by saying "ugh," "get away from my desk," and "come back when Sgt. Grau comes back;" and Johnson allegedly "refused to do anything for me." *Id*., ¶¶6-7. But "the officer who was working the other side of the unit did pick up the phone and call to get me medical attention after I showed him my injury." *Id*., ¶8. Washington states that he then "washed out his mouth and cleaned himself" and went directly to Sgt. Grau (not a defendant) and showed him the injury. *Id*., ¶9. Sgt. Grau responded by calling the Health Services Unit (HSU) and then directing Washington to go to HSU "right away." *Id*.; *see also* Dkt. No. 19, ¶6.[1]

The record confirms that, Washington was then seen in the HSU by Nurse Amanda Moore (not a defendant) on that same day at around 8:50 p.m. Dkt. No. 25-1 at 2. According to Nurse Moore's notes, Washington reported that he had sustained a laceration to his inner lower lip while playing basketball and claimed he was experiencing pain at a level of 7-8 out of 10. Dkt. No. 23, ¶10. She noted a small amount of bleeding and a slight amount of swelling in the lower lip. *Id*., ¶¶11-12. She observed his vitals were normal and reported that Washington was oriented as to his situation, the time, the place, and as to his person. *Id*., ¶¶13-16. Because there was no Provider on site that was authorized/qualified to determine whether sutures were necessary for the laceration on his lip, Nurse Moore sent Washington to the Emergency Room (ER) for further evaluation. *Id*., ¶¶17-23. Medical staff in the ER determined that sutures were not necessary for what they described as a "1-centimeter superficial laceration to the inner aspect of the lower lip." *Id*., ¶21.

---

[1] Johnson does not recall Washington having informed him of an injury that required medical treatment on April 7. Dkt. No. 23, ¶6. While he does not remember the incident, he states that if such an incident had occurred, his response would have been to notify a Sergeant. *Id*.

They also noted there were no other signs of dental of jaw injury. *Id.*, ¶¶21-22. After he was returned to the institution, Nurse Moore educated Washington on how to care for his injury, including signs to watch for in case the wound became infected. She instructed him to take acetaminophen 1000mg and ibuprofen 800 mg for pain and to use ice for swelling. *Id.*, ¶¶19 & 23. Washington received the ordered pain medication and ice, as well as an additional order for a saltwater rinse as necessary. *Id.*, ¶¶24-29.

About two weeks later, on April 16, 2020, Washington received a Conduct Report #92766 from Johnson based on the findings of a cell search that had taken place a month earlier, on March 18, 2020. *Id.*, ¶¶ 30-41.[2] The search was ordered by Lieutenant Filkins for the purpose of locating coaxial cables that were missing from the institution. *Id.*, ¶¶30, 31, & 41. During the cell search, Johnson confiscated two altered TV coaxial cables discovered in Washington's cell in violation of prison policy. *Id.*, ¶¶33-34. The contraband cables were immediately sent to the Captain's office, and Johnson began drafting the conduct report on that date, although he did not finish and finalize the report until April 16, 2020. *Id.*, ¶¶37-40. Johnson explains that he issued Conduct Report #92766 on April 16, 2020 because he believed Washington possessed contraband (altered coaxial cables) that could be used to jeopardize the safety and security of the institution. *Id.*, ¶¶62-65. Johnson notes that he started drafting Conduct Report #92766 on March 18 (the day the contraband was confiscated) but did not finish and finalize it until April 16 due to his workload and other job responsibilities. *Id.*, ¶37.

Washington was initially found guilty of the charges in the conduct report. *Id.*, ¶42. That decision was later reversed on appeal after Washington claimed that the contraband coaxial cables belonged to his cellmate (not him) and officials concluded there was "insufficient documentation"

---

[2] Washington contends that the cell search took place on April 16, 2020. Dkt. No. 34, ¶¶19-22. This assertion is contradicted by the record. While the conduct report is dated April 16, the report indicates that the search occurred on March 18 in response to an order from Lt. Filkins. Dkt. No. 23, ¶¶30-49. Moreover, Johnson confirms that all cell searches were suspended in April 2020 due to Covid-19. *Id.*, ¶¶46-49.

and "lack of follow-up" to prove the cables belonged to Washington. *Id.*, ¶¶42-45; *see also* Dkt. No. 24-2 at 1.

On April 20, 2020, four days *after* Johnson issued the conduct report, Washington filed Inmate Complaint #RCI-2020-8241 concerning Johnson's failure to treat Washington for his basketball injury. Dkt. No. 26-1 at 11. In the Inmate Complaint, Washington alleged that "Johnson refused to follow DOC Policy + address my medical emergency I was sent to the hospital for. I want Johnson suspended for 2 weeks without pay + a test of medical emergency." *Id*. Because Inmate Complaints are confidential at the institution, and Johnson does not have access to the Inmate Complaint Tracking System (which stores inmate complaints), he did not learn about Washington's inmate complaint against him until May 12, 2020, when Institution Complaint Examiner (ICE) Zeni emailed him to get his version of the April 7 events. Dkt. No. 23, ¶¶54-59. Johnson reported to ICE Zeni that he did not recall the events of that day and apologized for his lack of memory. *Id.*, ¶60.

Johnson testifies that he did not issue Conduct Report #92766 based on Washington's filing of Inmate Complaint #RCI-2020-8241. *Id.*, ¶51. He insists the April 7 incident was so unremarkable to him that he simply does not recall the interaction. *Id.*, ¶¶6 & 60. Moreover, he explains he could not have known about Inmate Complaint #RCI-2020-8241 when he issued the Conduct Report #92766 because the Inmate Complaint was not filed until four days *after* he issued the Conduct Report. *Id.*, ¶41. Johnson insists the record and timing show that Conduct Report #92766 had nothing to do with the alleged April 7 incident or Washington's Inmate Complaint. *Id.*, ¶52.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp.*

4

*v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

Johnson argues that he is entitled to summary judgment because the record confirms that Washington did not suffer any cognizable injury as a result of his alleged conduct on April 7, 2020 and because he could not have issued Conduct Report #92766 in retaliation for Washington's later-filed Inmate Complaint. Dkt. Nos. 22 & 37. The record confirms Johnson's position, and because no reasonable jury could find in Washington's favor, Johnson's summary judgment motion will be granted.

**1. Eighth Amendment Deliberate Indifference**

To survive summary judgment on an Eighth Amendment deliberate indifference claim, Washington must provide evidence from which a reasonable jury could conclude that: (1) he faced an objectively serious medical condition; and (2) Johnson subjectively knew about the medical condition and disregarded it. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citing *Arnett v.*

5

*Webster*, 658 F.3d 742, 750, 751 (7th Cir. 2011)). Additionally, in the context of "delayed" medical care, where an inmate receives medical care but argues that it could or should have been provided sooner, Washington must prove "some injury" separate from the underlying medical condition. *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020); *see Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed."). A mere delay in obtaining medical care for a prisoner does not rise to the level of a constitutional violation if the delay was immaterial because it did not result in any harm to the plaintiff. *See id*. Prisoner-plaintiffs asserting such a claim must come forward with some evidence that the delay caused some degree of additional harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013). "[N]on-expert evidence is sufficient as long as it permits the fact-finder to determine whether the delay caused additional harm." *Jackson v. Sheriff of Winnebago Cnty., Illinois*, 74 F.4th 496, 500–01 (7th Cir. 2023) (quoting *Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011)).

While it is far from clear that a jury could find that the cut lip Washington suffered playing basketball rises to the level of an objectively serious medical condition, the Court will assume it does for purposes of summary judgment. Washington's Eighth Amendment claim nevertheless fails because he has presented no argument or verifying medical evidence showing that any delay he might have experienced before going to the HSU as a result of Johnson's alleged failure to act caused Washington any *additional* harm separate from the laceration itself. As a preliminary matter, Washington does not articulate or clarify how long of a delay he believes he experienced as a result of Johnson's conduct. And he admits that he received prompt responses to his requests for medical care from another corrections officer and Sgt. Grau, both of whom he approached immediately after Johnson allegedly failed to act. Washington has not identified or articulated any basis on which a jury could conclude that any minor delay he experienced before being treated

6

caused any degree of additional harm sufficient to support his Eighth Amendment claim. Indeed, Washington's main gripe seems to be that Johnson responded with rude and dismissive words rather than immediately sending him to the HSU for evaluation. But even if Johnson's response was unprofessional, Washington has not explained how that conduct could possibly have caused him any additional harm. Indeed, Washington admits that, during his interaction with Johnson in the officer's station, "the other officer who was working the other side of the unit did pick up the phone and call to get me medical attention after I showed him my injury." Dkt No. 33, ¶¶6-8. Washington also admits that he later presented his injury to Sgt. Grau, who also called HSU and sent him to the HSU "right away." Dkt. No. 19, ¶6. Thus, although Johnson may not have acted immediately, Washington admits others did, limiting any additional harm to him separate from the laceration itself.

Moreover, Washington's medical records confirm that he went to the HSU on April 7 the same day he claims to have reported the head-butting incident to Johnson. Dkt. No. 25-1. Washington was treated by Nurse Moore and referred to a local ER, where it was confirmed that his injury was minor and did not require stitches. Washington was then returned to the institution where Nurse Moore offered further treatment information, pain medication, and ice to keep the swelling down. Thus, Washington undisputedly received all necessary treatment for his cut lip on the same day he experienced the injury while playing basketball.

Given these undisputed facts, Washington has no cognizable injury as a result of Johnson's alleged conduct, even if the events transpired exactly as Washington claims. At bottom, a §1983 claim is a "tort damage action," *see Lossman v. Pekarske*, 707 F.2d 288, 290 (7th Cir. 1983), and "[t]here is no tort…without an injury…," *see Jackson*, 733 F.3d at 790. Although Johnson may have been rude and dismissive towards him, the record confirms Washington received prompt medical care on April 7, 2020 after different correctional officers took timely action. There is no evidence that Washington suffered additional harm based on Johnson's alleged words and

7

inactions; and Johnson is therefore entitled to summary judgment on Washington's Eighth Amendment delay of medical care claim. *See e.g., Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019) (citing *Beal v. Foster,* 803 F.3d 356, 357–58 (7th Cir. 2015)) (explaining that prison staff's use of rude comments and even "repugnant words" do not rise to an Eighth Amendment violation because "[r]elationships between prisoners and prison staff are not always marked by genteel language and good manners").

   2. **First Amendment Retaliation**

To establish a prima facie case of First Amendment retaliation, Washington must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action. *Whitfield v. Spiller*, 76 F.4th 698, 707-08 (7th Cir. 2023) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)); *see also Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If Washington establishes a prima facie case, the burden shifts to Johnson to rebut the claim and show that the deprivation would have occurred regardless of the protected activity. *Manuel v. Nalley*, 955 F.3d 678, 680 (7th Cir. 2020) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012)). If this is established, Washington must then demonstrate that the proffered reason for the deprivation is "pretextual" or "dishonest." *Id*. (citing *Kidwell*, 679 F.3d at 969).

There is no dispute that Washington engaged in First Amendment protected activity by filing Inmate Complaint #RCI-2020-8241; and for purposes of summary judgment, the Court will presume that receiving a conduct report would likely deter First Amendment activity in the future. But there is no credible evidence that the filing of Inmate Complaint #RCI-2020-8241 was "a motivating factor" in issuing Conduct Report #92766. Indeed, Johnson issued Conduct Report #92766 on April 16 four days *before* Washington issued Inmate Complaint #RCI-2020-8241 on April 20. As a matter of logic, Johnson could not have been motivated to retaliate against

8

Washington for filing an Inmate Complaint that did not yet even exist.

Washington tries to create a dispute of fact by claiming in his response materials that he "told Johnson that he was *going* to file a complaint against him for not getting him the needed medical treatment" and Johnson "did know that Washington was filing a complaint against him." *See* Dkt. No. 34, ¶29. But this is a new version of the events, inconsistent with the story he alleged in his amended complaint. *See* Dkt. No. 19, ¶¶3-5. Washington originally (and mistakenly) claimed that cell search took place on April 16, 2020 and that he filed his inmate complaint four days later on April 20. *Id.*, ¶¶21 & 26. It was only after Johnson pointed out in his summary judgment materials that the cell search actually took place a month earlier, on March 18, that Washington changed his version of events and claimed he had told Johnson of an impending inmate complaint on April 7. Dkt. No. 34, ¶¶29 & 30. Toward that end, Washington provides no specific details about this new version of events, including when on April 7 this conversation allegedly happened, where it happened, or any other surrounding circumstances as to why the topic arose in the first place. *See id*. Washington's vague, conclusory, and self-serving affidavit is not enough to fabricate an issue of fact, allowing him to avoid survive summary judgment. *See e.g., Craig v. Wrought Washer Mfg., Inc.,* 108 F.4th 537, 543 (7th Cir. 2024) (noting that the Court is permitted to "disregard" a sham affidavit that contradicts prior sworn testimony).

In addition, Johnson has also provided a non-retaliatory explanation for issuing Conduct Report #92766—that Lieutenant Filkins had ordered a cell search on March 18 to locate missing coaxial cables at the institution and those coaxial cables were found in Washington's cell. Washington argues that Johnson's proffered reason for the conduct report is "pretextual" or "dishonest," but he admits that contraband coaxial cables were in fact found in his cell, claiming they actually belonged to his cellmate. Washington appears to imply that it is suspicious that he had a dispute with Johnson on April 7 and Johnson *then* chose to finalize and issue a conduct report on April 16 (for an incident that occurred a month prior on March 18.) But suspicious timing alone

9

is insufficient evidence to establish pretext or dishonesty. *Manuel*, 966 F.3d at 681. Washington then attempts to assert that "Defendant Johnson DID NOT search [his] cell on March 18, 2020," *see* Dkt. No. 34, ¶21, but this (once again) changed story is contradicted by the contemporaneous evidence, including Washington's own statement in his conduct report appeal. *See* Dkt. No. 24-2. The record establishes that Johnson conducted the cell search on March 18 and no cell searches occurred in April 2020 due to Covid-19 restrictions. *See* Dkt. No. 24-2; *see also* Dkt. No. 26-4 and 26-5. Finally, Washington states that his cellmate had confessed that the contraband coaxial cables were his, so CO Johnson knew he was giving Washington a false conduct report. But CO Johnson was not required to believe everything an inmate says, *see Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014) (noting that prison staff are not required to believe everything inmates say), and it was reasonable for CO Johnson to believe that contraband coaxial cables found in Washington's cell belonged to Washington. CO Johnson is therefore also entitled to summary judgment on the First Amendment retaliation claim and the Court will dismiss this case.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment (Dkt. No. 21) is **GRANTED**; and this case is **DISMISSED**. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on January 15, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.